FILED

2005 Sep-09  PM 02:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIE E. PETTY, JR,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | **CASE NO.:** |
| | ] | **CV-03-2023-VEH** |
| **v.** | ] | |
| | ] | |
| | ] | |
| **ANTHONY J. PRINCIPI,** | ] | |
| **SECRETARY OF THE** | ] | |
| **DEPARTMENT OF** | ] | |
| **VETERANS AFFAIRS,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## Memorandum of Opinion

## I.      INTRODUCTION

This is a civil action filed July 31, 2003, by the Plaintiff, Willlie E. Petty, Jr.,

against the Defendant, Anthony Principi, Secretary, Department of Veterans Affairs.

The complaint alleges violations of the Americans With Disabilities Act ("ADA"),

42 U.S.C. § 12101 *et seq*. Plaintiff alleges that the Defendant discriminated against

him based on his disability and retaliated against him based on prior protected

activity.  The Plaintiff contends: (1) that he was denied a promotion because of his

disability in violation of the ADA; (2) that he was retaliated against because of prior

protected activity by being required to undergo a Functional Capacity Evaluation

("FCE"); and (3) that Defendant "with reckless indifference discriminated and retaliated against Mr. Petty because of his disability with regard to job assignments, placing him on leave without pay, termination, and other terms and conditions of employment." (Compl. ¶ 5).

Presently before the Court is the Defendant's Motion for Summary Judgment. (Doc. 13). For the reasons stated herein, the motion will be **GRANTED IN PART** and **DENIED IN PART**.

## II.    FACTS

Plaintiff began work at the Birmingham VA Medical Center (BVAMC) in 1986 as a WG-1, Step 1 Food Service Worker. (Def. Ex. 1). Six months later, Plaintiff was promoted to a WG-2 Food Service Worker. (Def. Ex. 2). The classification "WG" stands for "wage grade." (Barnett Dep. at 7). Janet Barnett, a staffing specialist at BVAMC for 15 years, explained that a WG job is a blue collar job. *Id.* Regarding the number assigned to the WG (as in WG-1 or WG-2), Ms. Barnett testified that "[e]ach position has a grade assigned to it. And the grade is based on the complexity of the position." *Id.* at 11.

The Plaintiff testified that he began working only four hours a day and has never held another position – although he eventually began working 8 hour days. (Petty Dep. at 18). He would, from time to time, "detail" to a WG-3 position–but

2

never for more than 10 days. *Id.* He testified that he was not detailed to any other positions, but that he filled in for different grades of Food Service Workers. *Id.* at 19. Further, the Plaintiff testified that he was never given a temporary detail by the personnel office–they would just need someone in a given position and get him to do it. *Id.* at 19-20.

Some WG-2 positions in the nutrition and food services department include delivering trays, picking up trays, portioning, sanitation, cleaning, mopping, and sweeping. (Fenderson Dep. at 11). Both WG-2 and WG-3 level employees have performed the duty of wrapping silverware. *Id*. at 13-14. Moreover, WG-2 employees have assembled bags for ambulatory surgery lunches as well. *Id.* at 61. Examples of WG-3 duties are tray-line positions, portioning of food, and wrapping silverware. *Id.* at 11-14. They also do pre-prep for the items that are needed on the tray line, as well as clean and relieve for the WG-4 employees. *Id.* at 32.

In December, 1997, the Plaintiff injured himself while pushing food carts at BVAMC and subsequently underwent back surgery. (Petty Dep. at 53-54). The parties have not explained, nor cited, what position the plaintiff held at that time, nor given a chronology of events up to that time. Because there is no evidence to the contrary, the Court must assume that the Plaintiff held the WG-2 position at the time of his accident and thereafter.

3

The Plaintiff testified that he submitted to a Functional Capacity Evaluation (FCE) in 1999 that resulted in numerous work restrictions.  (Petty Dep. at 56).  The Plaintiff testified that one restriction required him to sit twenty minutes every hour. *Id.*  The restrictions resulting from the 1999 FCE were considered permanent.  *Id.* at 69.  In their briefs, the parties do not explain, nor cite to, the restrictions.  There are indications in the file that the Plaintiff went to light duty.  However, neither party explains the Plaintiff's situation in detail nor cites to evidence on this point.

On February 7, 2001, the VA Office of Employment Discrimination Complaint Adjudication (OEDCA) found that the BVAMC discriminated against the Plaintiff on the basis of his disability when the Plaintiff was refused a temporary detail promotion to WG-3, Food Service Worker on April 28, 2000.  (Def. Ex. 4 at 17-19).  In its decision, the OEDCA ordered the BVAMC to offer the Plaintiff a temporary thirty day detail to WG-3 Food Service Worker with reasonable accommodation and attendant pay.  *Id.* at 20.

Among other things, the position description for a WG-3 Food Service Worker position included the essential duty of manning a centralized tray line.  (Def. Ex. 5).  Manning the tray line  required the ability to accomplish, in a timely manner, with significant redundancy for continuous periods of 90 to 105 minutes, the preparation of between 100 to 120 meals on a time sensitive production line consisting of four

personal.[1]  *Id.*  Each of the four persons manning the centralized tray line had to

transverse from left to right approximately ten feet; fore and aft approximately four

feet; reach-lean at approximately a 45 degree angle downward and then upward-

forward two to three  feet six to seven times as each tray passes by, placing food items

on the tray; and occasionally bend to lower shelves to restock the tray line.  *Id.*

Further, each of the four personnel manning the centralized tray line had to bend,

reach, and squat to sanitize his assigned work area between tray line operations.  *Id.*

Finally, each of the four personnel manning the centralized tray line had to lift, bend,

and reach while preparing food items for the tray line, and each was required to push

and pull tray carts.  *Id.*

As of February 27, 2001, the Plaintiff was under the following medical

restrictions by Dr. Martin Jones of Alabama Sports Medicine and Orthopaedic

Center:  maximum frequent lifting of 31 pounds; maximum lifting of 117 pounds;

may carry 25-30 pounds short distances; should probably not climb ladders; should

not stoop (bending the body downward and forward by bending the spine at the

waist); and occasional squatting (bringing body downward by bending legs, knees,

---

[1]The Plaintiff admits this statement but contends that "some additional essential duties
include providing assistance in food preparation by weighing, measuring and assembling ingredients
according to standardized recipes and performing a wide variety of food service, cleaning, and
sanitation duties."

and hips). *Id.* Also, the Plaintiff was required to sit 20 minutes of each hour. *Id.* While the parties agree that these restrictions were in place, neither party explains if these were from the initial FCE or a separate doctor's visit.

Plaintiff testified that he could perform some jobs under his restrictions, including a WG-2 nourishment job, which entailed any type of supplemental feeding, adhering to snack requests, fixing of ambulatory and dialysis meals, and wrapping of silverware. (Petty Dep. at 80-81). The plaintiff performed WG-3 work before when he wrapped silverware and helped prepare it for all three meals in the day. *Id.* at 86. Also, the Plaintiff testified that he performed WG-6 tasks by making ambulatory lunches and dialysis lunches. *Id.* at 86.

As of February 27, 2001, BVAMC was unable to identify reasonable accommodations that would afford Plaintiff the ability to perform the essential functions of the WG-3 Food Service Worker that is located on the tray line. (Def. Ex. 5). On or about February 27, 2001, the BVAMC solicited the Plaintiff's input in identifying reasonable accommodations that would enable him to perform the essential functions of the WG-3 Food Service Worker that is located on the tray line. *Id.* In response, the Plaintiff identified one (1) reasonable accommodation: set a stool on the tray line. (Def. Ex. 6).

BVAMC subsequently inquired of Dr. Jones, the physician who had placed

6

Plaintiff under the medical restrictions, whether Plaintiff could be reasonably accommodated to perform the essential functions of the WG-3 Food Service Worker located on the tray line. (Def. Ex. 7). On March 23, 2001, Dr. Jones responded that Plaintiff was not medically qualified for re-assignment to the WG-3 Food Service Worker position and that there are no accommodations that would allow Plaintiff to work within his medical restrictions.[2]  (Def. Ex. 8).

On or around March 29, 2001, Mr. Y.C. Parris, Chief Executive Officer of the BVAMC, sent a memorandum to the OEDCA requesting that it rescind its Final Agency Decision. (Def. Ex. 9). The OEDCA concluded that the memorandum was insufficient to support a rescission of the Final Agency Decision issued on February 6, 2001. *Id.*  However, the OEDCA did remove the requirement to place the Plaintiff in the WG-3 classification, writing:

> Mr. Parris also notes that due to the complainant's current physical condition, he has been unable to comply with the order to assign the complainant to the 30-day detail. Medical documentation obtained from the complainant's doctor (Dr. Jones) dated March 23, 2001, reveals that the complainant is not medically qualified for the WG-3 detail and that there are no accommodations that would allow him to work within his medical restrictions. Based on the foregoing, we modify the equitable relief awarded to the complainant in the Final Agency Decision issued February 6, 2001, as follows: *The agency shall immediately award attendant pay and other benefits the complainant would have earned in*

---

[2] Plaintiff admits that this statement is true, but states "to clarify, Dr. Jones wrote them at a later date stating the 20 minutes restriction should be reinstated."

> *connection with the temporary 30-day detail to the GS-7804-3, Food Service Worker position.*

*Id.* Presumptively, the Plaintiff was never given the position; although, again, the parties do not explain what happened to this position.

On August 20, 2002, Plaintiff was advised that he had been non-selected for a temporary detail to a WG-3 Food Service Worker position.[3] (Def. Ex. 10). In his sworn statement to the VA, Curtis Stanton, then Chief of Food Production and Service, who supervised the kitchen operation, and who was responsible for this particular hiring decision, testified that Mr. Petty was not selected for the position because "Mr. Petty's doctor said he couldn't perform that duty." (Def. Ex. 11 at 7). Mr. Stanton stated that "there wasn't any way we could accommodate him to do the essential tasks of the WG-3 worker." *Id.*; *see also Id.*, at 14-15. Also, Mr. Stanton stated that Mr. Petty had never performed the essential functions of that position before. *Id.* at 8. Further, he stated that neither Mr. Petty's disability nor his prior EEO activity had any effect on his decision. *Id.* at 9.

On September 30, 2002, the Plaintiff filed a Complaint of Employment Discrimination with the VA. *Id.* The Complaint alleges that the denial was a reprisal for prior and present EEOC Complaints and the OEDCA's final decision.

---

[3]The Parties do not make this clear, but this is apparently a separate position from the one previously discussed.

In October, 2002, the BVAMC ordered the Plaintiff to undergo another FCE to assess the Plaintiff's work capacity and thereby promote the efficiency of the Food and Nutrition Services Department (FNS) in meeting patient needs.[4]  (Def. Ex. 14). Dr. Chiou, the administrator of the second FCE, found that the Plaintiff met or exceeded the requirements for food services, and he found that the Plaintiff was capable of safely performing in the DOT-moderate classification: frequent lifting to 35 pounds, constant carrying to 20 pounds, push/pull to 50 pounds frequently and 25 pounds constantly.  (Pl. Ex. 3).  The doctor also reduced the Plaintiff's sitting restriction to 10 minutes per hour.  *Id.*  Again, however, a copy of the actual functional capacity evaluation has not been included in the evidence.

On November 26, 2002, Ms. Barnett's office was asked to "conduct a review of current vacancies for possible placement of Willie Petty, Food Service Worker, WG-2.  Most recent medical information and OPF[5] are attached for your review." (Williams Dep. Pl. Ex. 11).  The memorandum requesting the review also noted that "[t]he most recent evaluation regarding Mr. Petty states that he needs to take a rest break for 10 minutes per hour."  *Id.*  It also asked the recipient to "[p]lease state

---

[4]  Plaintiff admits that this statement is true, but states "to clarify, the reason for the FCE was not for efficiency but to get an independent opinion on what the restrictions of plaintiff's disability were."

[5]Official Personnel Folder.

'none' if placement is not possible."  *Id.*

Ms. Barnett testified to receiving the memorandum, signing it, and writing

"none" on it.  (Barnett Dep. at 9).  She also testified as follows:

> Q     So according to this, you were not able to find a position for Mr.
> Petty to fill?
>
> A     Correct
>
> Q     What kind of search do you do when looking for alternate
> employment or an alternate position for an employee.
>
> * * *
>
> A     The way that it's done with every person that I'm given the folder
> for, the OPF is attached and the a copy of the medical.  And in Mr.
> Petty's case, he was a WG-2, so that meant that he could take another
> WG-2 job or perhaps a GS-2, maybe even a GS-3, and, of course, basing
> on his physical limitations.

*Id.* at 9-10.

On November 27, 2002, the following persons met with Plaintiff and his

attorney to discuss the results of his October, 2002, FCE: Ms. Latricia Williams,

BVAMC Employee Relations Specialist; Ms. Delphine Fenderson, BVAMC Chief,

FNS; Mr. Curtis Stanton, Assistant Chief, FNS; and Ed Culbreath, Labor Relations.

(Def. Ex. 19).  The agency informed the Plaintiff that the BVAMC could no longer

provide the light duty status as required by the findings of the FCE, because it was

having an adverse impact on the ability of FNS to meet its mission requirements,

because it  was adversely affecting other employees in the FNS who were doing their duties and many of Plaintiff's duties as well,[6] and because of changes in the service that placed a premium on efficiency. *Id.*   Plaintiff was unable to suggest any light duty accommodation that he could do but still meet the limitations indicated in the FCE.[7]  *Id.*  Specifically, the BVAMC that it was no longer able to provide light duty to Plaintiff because of the BVAMC's conversion to a new advance meal preparation system which kept Plaintiff from being able to deliver and pick up trays.[8]  *Id.*

On December 4, 2002, the Plaintiff filed another Complaint of Employment Discrimination with the VA, again alleging reprisals for prior EEOC complaints, continued harassment, and another failure, in November of 2002, to promote to WG-3.[9] (Def. Ex. 17).

In addition to working at BVAMC, Plaintiff also worked for Burns Security as a security guard during the period from 2000 to 2002.  (Def. Ex. 16).  As a security

---

[6]  Plaintiff admits that this statement is true, but states "to clarify no employees ever complained specifically about the plaintiff's restrictions hindering his ability to work."

[7]  Plaintiff admits that this statement is true, but states "to clarify the plaintiff was willing to do the necessary work if he was able to adhere to the twenty minute restriction while also being allowed to sit on a stool in the tray line."

[8]  Plaintiff admits that this statement is true, but states "to clarify, the plaintiff was accommodated for over a year after the advance meal preparation system was in place."

[9]  Again, the parties are not clear, but it appears that this is a third denial of promotion, unrelated to the other two cited instances.

guard for Burns Security, Plaintiff worked at a Wal-Mart and some Bruno's stores before getting a full-time slot at Southeastern Meats.  (Petty Dep. at 35).  Plaintiff continued to work at Burns Security until he quit on November 23, 2002.[10]  (Def. Ex. 18).  The Plaintiff testified that the job did not require walking and mostly entailed overseeing activities or products while sitting down.  (Petty Dep. at 39, 42-43).  The plaintiff testified that he resigned from Burns Security when he was asked to walk around more often and he was unable to do so because of his injury.  *Id.* at 46. A handwritten memo from Debra Kilgore, a branch manager at Burns,  states that the Plaintiff "work [sic] at one of my Perm. Accounts at this account Mr. Petty watches over a gate and some truck.  He is not required to stand bend or walk."  (Pl. Ex. 1).  A December 3, 2001, memo to the VA from Lynn Montgomery at Burns  states that "this is not a standing or walking or patrol assignment it is a stationary post.  Sitting down the entire shift."  (Pl. Ex. 2).

Later correspondence from Burns showed that the Plaintiff was employed without restrictions, and that he never requested any medical work restrictions.  (Def. Ex. 15).  Also, the correspondence shows that depending on where he was stationed, Mr. Petty might be required to sit/stand and/or stand/walk his entire tour.  *Id.*  Also,

---

[10]  Plaintiff admits that this statement is true, but states "to clarify, the plaintiff was forced to quit because of his disability."

the correspondence stated that Mr. Petty had been detailed to tours that required continuous standing/walking for periods as long as six hours.  *Id.*

The manager of the BVAMC FNS discussed with the Associate Director of the BVAMC the fact that the FNS was short-staffed.  (Shamlin Dep. at 10).  Because the department was short-handed, the FNS was paying overtime just to get meals prepared and patients fed.  (Fenderson Dep. at 37).  Delphine Fenderson, Chief of Nutrition and Food Service, testified that the Plaintiff was doing less than four hours of work per day and was being paid for eight hours.  *Id.* at 40.  The Defendant contends that this contributed to the shorthandedness.  *Id.* at 37.  However, the Plaintiff notes that Ms. Fenderson testified that the department was shorthanded because people were sick, or on leave, or retired.  *Id.* at 38.  Ms. Fenderson also testified that it was not difficult to hire persons in the food service department.  *Id.* at 38-39.

As of January 15, 2003, the BVAMC proposed to remove the Plaintiff due to his medical restriction.  (Fenderson Dep. Pl. Ex. 19).  Also, it was stated that the Plaintiff's medical restriction went against the promotion of efficiency.  *Id.*  After the second FCE, the BVAMC determined that there were no vacant jobs available in the hospital that the Plaintiff could perform and soon thereafter, a removal was proposed for the plaintiff.  *Id.*  The Plaintiff was removed from his WG-2, Food Service Worker

position at BVAMC effective February 9, 2003. (Def. Ex. 21).  The reason for removal was "inability to perform the essential factors of the job due to medical disability."  *Id.*

The information used to draft the proposed removal letter came from an evidence file that included the FCE and medical documentation.  (Williams Dep. at 15).  Once the plaintiff was removed from employment at the BVAMC, no other employees were specifically hired to take over the job he was performing. (Fenderson Dep. at 55-56).

The plaintiff received successful performance evaluations for the following time periods: 11/30/2000 to 3/31/2001 and 4/1/2001 to 3/31/2002.

## III.   STANDARD OF REVIEW

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.*  Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004).

## IV.   DISCUSSION

Plaintiff alleges disability discrimination when he did not receive two temporary details as a WG-3, Food Service Worker (Complaint ¶¶ 18, 19) and when BVAMC separated him from employment (Plaintiff's Complaint ¶ ¶ 27-29).[11]   A plaintiff establishes a *prima facie* case of discrimination under the Rehabilitation Act if he shows that: (1) he is disabled; (2) he was a "qualified individual" with a disability; and (3) he was discriminated against because of his disability.  *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003).  The same standards used to determine whether the Rehabilitation Act has been violated shall be used to determine violations of the ADA.  *Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir. 1997).

### A.    Has the Plaintiff Established a Prima Facie Case of Discrimination?

In order to prevail, the Plaintiff has the burden of establishing a prima facie case of discrimination by demonstrating: (1) that the Plaintiff was disabled due to a substantially limiting impairment; (2) that the Plaintiff is a "qualified" individual; and (3) that the Plaintiff was discriminated against because of his disability.  Once the

---

[11] Plaintiff, at his deposition, abandoned his claim for Leave Without Pay.  DEX, Plaintiff's Deposition, p. 78.

Plaintiff has met this burden, it falls to the Defendant to show that it had a legitimate,

non-discriminatory reason for Plaintiff's termination.

### 1.   Is the Plaintiff Disabled?

During oral argument on this Motion for Summary Judgment, both parties

agreed that the Court's determination of whether the Plaintiff was disabled should be

decided under *Rossbach v. City of Miami*. [12]   (Oral Argument Tr. at 6).

The ADA defines "disability" to include: "(a) a physical or mental impairment

that substantially limits one or more of the major life activities of such individual; (b)

a record of such impairment; or (c) being regarded as having such an impairment."

*Rossbach*, 371 F.3d at 1357, *quoting* 42 U.S.C. § 12102(2).  The Plaintiff asserts that

he is disabled under all three definitions.  (Compl. ¶ 3).

Disability under the first definition above involves a three-step analysis.

*Rossbach*, 371 F.3d at 1357, *citing Bragdon v. Abbott*, 524 U.S. 624 (1998).  First,

the Plaintiff must be impaired.  *Id.*  Second, the court must identify the life activity

that the Plaintiff claims has been limited and determine whether it is a major life

activity under the ADA.  *Id.*  Finally, the court must determine whether the Plaintiff's

---

[12]  371 F.3d 1354 (11th Cir. 2004). For the purposes of this motion, *Rossbach* will control
to the extent it is applicable to the facts of the present case.  However, to the extent that *Rossbach*
is not applicable, the court will assume the Plaintiff disabled pursuant to the Defendant's concession.
(*See* Def.'s Mot. for Summ. J.).

16

impairment substantially limits that life activity.  *Id.*

First, physical impairment means: "(1) [a]ny physiological disorder, or condition, . . . affecting one or more of the following body systems: neurological, [or] musculoskeletal."   29  C.F.R.  §  1630.2  (h)(1).   The Plaintiff suffers from "degenerative joint disease of the lumbosacral spine with recurrent lumbar strain." (Compl. at ¶ 3).  Accordingly, the Plaintiff is physically impaired.   However, a physical impairment alone is not necessarily a disability, a plaintiff must also show that the impairment substantially limits a major life activity.  *Hilburn v. Murata Elect. N. Am.,* 181 F.3d 1220, 1226 (11th Cir.1999).

Second, the Plaintiff states that his impairment "substantially limits his ability to stand and stoop," and thus, the Plaintiff concludes that his impairment "substantially limits one or more of his major life activities."  (Compl. at ¶ 3).  Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Rossbach*, 371 F.3d at 1357, *quoting* 45 C.F.R. § 84.3(j)(2)(ii). Standing and stooping are not included within the definition of major life activities.  *See Id.*  However, this is not an exhaustive list.  29 C.F.R. pt. 1630, App. at 364.  "For example, other major life  activities  include,  but  are  not  limited  to,  sitting,  **standing**,  lifting,  [and]

reaching."[13] *Id.* (emphasis added).  Accordingly, standing is a major life activity under the ADA.

Finally, the Plaintiff must show that his impairment substantially limits the major life activity named.  In *Rossbach*, the Eleventh Circuit Court of Appeals affirmed the district court's holding that the plaintiffs' impairments did not substantially limit any major life activities.  *Rossbach*, 371 F.3d at 1359.  The Eleventh Circuit reasoned that "the officers' testimony . . . was couched in vague terms and unaccompanied by any evidence that the described afflictions were any worse than is suffered by many adults."  *Id.*  Specifically, the *Rossbach* court noted the vagueness of the plaintiffs' averments that they could not sit or stand "for long periods" or that they "cannot sleep normally."  *Id.*

In the present case, however, the Plaintiff was under a specific work restriction requiring him not to stand for more than forty minutes at a time.  (Def. Ex. 5 at 4). Further, the Plaintiff proffered a Final Agency Decision in which the OEDCA found the Plaintiff disabled because his physical restrictions "indicate that he is substantially limited in the ability to stoop and stand."  (Def. Ex. 4 at 13).  Because the Plaintiff has provided evidence of a specific work restriction as well as the OEDCA's finding of

---

[13] Having found that standing is a major life activity, the court will not decide whether stooping is a major life activity under the Act.

disability, the Plaintiff has provided sufficient evidence such that a reasonable juror could find that the Plaintiff's impairment substantially limits the major life activity of standing.[14]

## 2.      Is the Plaintiff A Qualified Individual ?

An otherwise qualified handicapped person is "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others. . ." 29 C.F.R. § 1614.203(a)(6).  To be a "qualified individual" "a person must be able to perform the essential functions of his or her job with or without a reasonable accommodation." *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003), *cert. denied*, 2003 WL 21938907, 72 U.S.L.W. 3147 (U.S. Nov. 3, 2003)(No. 03-225).  An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability - unless doing so would impose undue hardship on the employer.  42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).  An accommodation can qualify as

---

[14] The Plaintiff also alleges that his impairment substantially limits the major life activity of working. (Doc. 21 at 20).  Like the plaintiffs in *Rossbach*, however, the Plaintiff has not shown that he is precluded from any job other than the one he previously held.  Thus, the Plaintiff has not presented any evidence to show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Rossbach*, 371 F.3d at 139, *quoting* 29 C.F.R. § 1630.2(j)(3)(i).  Accordingly, the Plaintiff's impairment does not substantially limit the major life activity of <u>working</u>.

"reasonable," and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998). The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997).

### a. Would a Reasonable Accommodation Allow Plaintiff to Perform the Essential Duties of the WG-3 Position?

The Plaintiff must present sufficient evidence such that a reasonable juror could find that he is qualified with or without "reasonable accommodation" to perform the essential duties of the WG-3 position. At the time the Plaintiff was denied promotion to the WG-3 detail, the Plaintiff was under a mandatory work restriction that required the Plaintiff to sit for twenty minutes of every hour. (Def. Ex. 3 at 56). However, the Plaintiff contends that he is a qualified individual and that "the only accommodations [sic] [he] needed was a stool to sit down on every 20 minutes per hour."[15] (Compl. ¶ 19; Doc. 21 at 25). Further, the Plaintiff asserts that

---

[15] The Defendant stated that it tested the stool on the tray line and "found that the WG-3 tray line work could not be accomplished while sitting on a stool." (Doc. 14 at 11-12). However, this assertion was not connected to any evidence in the record. For the purposes of this motion, the statement will not be considered, because the Court's determination to grant or deny a motion for summary judgment is based only on "pleadings, depositions, answers to interrogatories, []

the stool would allow him to "perform the job to the best of his ability." (Doc. 21 ¶ 54).

It is undisputed that the Plaintiff met his first burden by identifying an accommodation. Thus, the question becomes whether the Plaintiff has provided sufficient evidence such that a reasonable juror could find that the stool enables him to perform the essential functions of the WG-3 position.

In response to the Plaintiff's request for the stool, the Defendant sought Dr. Jones, the Plaintiff's physician's, opinion as to whether the stool would enable the Plaintiff to perform the essential duties of the WG-3 position. (Def. Ex. 7 at 1). Dr. Jones responded by stating that the Plaintiff was not medically qualified for re-assignment to the WG-3 position. *Id.* Further, Dr. Jones stated that he could not "identify any reasonable accommodations that would allow [the Plaintiff] to work within the medical restrictions in place and accomplish the essential duties noted." (Def. Ex. 8 at 1).

The Plaintiff's only proffer of evidence is his own opinion that he can perform

---

admissions on file, [and] affidavits." Fed. R. Civ. P. 56(c).

the essential duties of the job in question.[16]  (Doc. 21 ¶ 54).  However, the Plaintiff's reliance upon a mere conclusory allegation unsupported by specific facts is insufficient to defeat the Defendant's Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56(e).  Further, "[m]ere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995); *cert. denied*, 516 U.S. 817 (1995).

Because the Plaintiff has failed to rebut Dr. Jones' testimony by providing specific contradictory evidence that the stool would enable him to perform the essential functions of a WG-3 employee, the Court concludes that the Plaintiff has failed to present sufficient evidence such that a reasonable juror could find that the stool or any other accommodation would enable him to perform the essential duties fo a WG-3 employee.   Accordingly, the Defendant's Motion for Summary Judgment is due to be **GRANTED** as to the failure to promote discrimination claim.

> **b.    Would a Reasonable Accommodation Allow Plaintiff to Perform the Essential Duties of the WG-2 Position?**

---

[16]  The Plaintiff asserts that he "previously had performed the WG-3 duties with his disability and did a good job." (Doc. 21 at 24; *citing* PEX, Final Agency Decision, dated 7/1/03).  However, "PEX Final Agency Decision, dated 7/1/03" is not included in the evidence submitted, and "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Jones v. Sheehan, Young & Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir. 1996).

At the time of the Plaintiff's termination, he was working in a limited duty WG-2 position.  (*See* Fenderson Dep. at 28). To survive summary judgment on his claim of discrimination by termination, the Plaintiff must present sufficient evidence such that a reasonable juror could find that he is able, with or without accommodation, to perform the essential duties of the WG-2 position.

First, the Plaintiff contends that the Defendant conceded the reasonableness of his accommodation by allowing him to work under the twenty minute sitting restriction for the previous five years.  (Doc. 21 at 22).  However, the Eleventh Circuit has held that a defendant's decision to cease making accommodations that were in excess of that which the law requires did not necessarily violate the plaintiff's rights under the ADA.  *See Holbrook*, 112 F.3d at 1528.  Similarly, a requested accommodation is not per se reasonable merely by virtue of past benevolence. *Dempsey v. Dekalb County*, No. 1:98-CV-3130-TWT, 2000 WL 33300667 (N.D. Ga. Mar. 17, 2000) (finding evidence "independent and apart" from the defendant's past accommodation existed which created a material issue of fact as to the reasonableness of the plaintiff's accommodation).  Thus, determining what is reasonable for each employer is not based on past accommodation, but rather, on a "highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation." *Holbrook*, 112 F.3d at 1527.

23

The record indicates that the Plaintiff's work restriction had been lowered from twenty minutes per hour sitting to ten minutes per hour sitting. (Pl. Ex. 3). Further, the Plaintiff had performed the modified duty role for almost five years when the Defendant decided it could no longer accommodate him in this manner. (Doc. 21 at 22). The Plaintiff states that, while under the twenty minute per hour sitting restriction, he received successful performance evaluations for the periods of November 30, 2000, through March 31, 2001, and April 1, 2001, through March 31, 2002. (Pl. Exs. 4 & 5). Further, the Plaintiff avers that he "was never reprimanded for attendance problems and no individual co-workers complained about his job performance." (Doc. 21 at 22). Finally, the Plaintiff lists a number of "essential tasks" that he can perform during the twenty minutes per hour that he has to sit. *Id.*

The Defendant contends that the Plaintiff never performed the essential duties of a WG-2 employee. (Doc. 14 at 12; *citing* Fenderson Dep. at 11-13, 16-28, 40, 43-46). However, the Defendant does not question the Plaintiff's ability to perform the essential duties of the job during the forty minutes per hour he is standing and working. Nor does the Defendant question the fact that the Plaintiff continued to perform "work tasks while seated." (*See* Doc. 32 at 21).

Because of the conflicting evidence as to whether the Plaintiff was performing the essential duties of his position, the Plaintiff has created an issue of fact as to

24

whether the accommodation of modified duty enabled him to perform the essential duties of the WG-2 position.  Accordingly, regarding the Plaintiff's termination from the WG-2 position, a genuine issue of material fact exists as to whether the Plaintiff was a qualified individual.

### 3.    Was the Plaintiff Discriminated Against Because of His Disability?

The Defendant admits that the Plaintiff was officially removed from his duties as a WG-2 food service worker position at the BVAMC due to his medical disability. (Doc. 32 at 11 ¶ 61).  Thus, for the purposes of this Motion for Summary Judgment, the Plaintiff has established a prima facie case of discrimination as to his claim of disability discrimination by termination.

### 4.    Did the Defendant Have a Legitimate, Non-Discriminatory Reason   for Plaintiff's Termination?

Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the challenged action.  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). The plaintiff must then present "significantly probative" evidence to prove that the articulated reason is merely pretext for intentional discrimination.  *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991); *citing Carter v. Miami*, 870 F.2d 578, 584 (11th Cir. 1989).

A plaintiff can demonstrate pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons. . . that a reasonable fact finder could find them unworthy of credence. . . .The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp. 1273, 1281 (M.D. Ala. 2000) (citations omitted).   The plaintiff is allowed to produce evidence "sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).   A plaintiff attempting to show pretext under the *McDonnell-Douglas/Burdine* framework must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Combs*, 106 F.3d at 1538; *quoting Sheridan v. DuPont*, 100 F.3d 1061, 1072 (3d Cir. 1996).   A plaintiff may show pretext using comparative evidence, statistical evidence, or direct evidence of discrimination.  *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir. 1985).  Once the plaintiff has met this burden, the Court "may not predetermine the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered

by the employer." *Sheridan*, *supra* at 1072.

The Defendant stated that it could longer provide light duty to the Plaintiff because: (1) of the introduction of an advanced food preparation system prevented the Plaintiff from delivering and picking up trays; (2) the Plaintiff was unable to perform the essential functions of a WG-2 food service worker; (3) the Plaintiff's accommodation had an adverse impact on the FNS's ability to reach its mission requirements and adversely affected the other employees in the FNS; (4) there were no reasonable accommodations that could be identified to help the Plaintiff; and (5) there were no other vacant positions that would fit under the Plaintiff's restrictions. (Doc. 14 at 7 ¶¶ 35-41).

First, the Plaintiff admits that the introduction of the new system prevented the Plaintiff from delivering and picking up trays.  (Doc. 21 at 4 ¶ 37).  However, the Plaintiff states that the Defendant continued to accommodate the Plaintiff for over a year after the new system was in place.  *Id.*  Also, during the year that the Defendant continued to accommodate the Plaintiff, the record indicates that the Plaintiff was given successful evaluations.  (Pl. Ex. 5).  The Plaintiff has shown sufficient inconsistency with the Defendant's proffered legitimate reason for terminating him such that a reasonable juror could find this reason unworthy of credence.

Second, as stated above, there exists a genuine issue of material fact as to

27

whether the modified duty accommodation provided by the Defendant to the Plaintiff for the previous five years enabled the Plaintiff to perform the essential duties of the WG-2 position. Thus, a reasonable juror could conclude that the Defendant's second stated reason for the Plaintiff's termination was not the real reason.

Third, the Defendant maintains that continuing to accommodate the Plaintiff precluded the FNS from meeting its mission requirements and adversely impacted other employees. (Doc. 14 at 7 ¶ 35). In essence, the Defendant is attempting to show that continuing to accommodate the Plaintiff constituted an undue burden. Couching its undue burden argument as a legitimate non-discriminatory reason for termination does not relieve the Defendant of its burden to prove the affirmative defense of undue burden. *See Willis*, 108 F.3d at 285(finding that undue burden is an affirmative defense which is to be pled and proven by the defendant). Allowing the Defendant to assert that the Plaintiff's accommodation created an adverse impact on FNS and its employees as a legitimate nondiscriminatory reason would allow the Defendant merely to"articulate" an undue burden rather than "prove" an undue burden. Accordingly, the Defendant will retain the burden of proof as to its claim that the Plaintiff's accommodation constituted an undue hardship. Since the Defendant has the burden of proof at trial, it could only prevail on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of

material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Because the Defendant has failed to provide any data or evidence which would demonstrate inefficiency or adverse impact, the Court can not hold as a matter of law that continuing the Plaintiff's accommodation placed an undue burden on the Defendant.

Fourth, it is undisputed that the Plaintiff failed to name alternative accommodations, other than the modified duty accommodation, that would enable him to perform the essential duties of his position after the Defendant notified him that the previous accommodation would be discontinued. (Def. Ex. 20). However, there exists a genuine issue of material fact as to whether the previous accommodation was reasonable. Thus, to the extent that the first accommodation, the modified duty position, was reasonable and required by the ADA, the Plaintiff has produced evidence to create a question of fact as to whether the Defendant's reason for terminating the Plaintiff is worthy of credence. However, if the previous accommodation is found not to be reasonable and therefore not required by the ADA, the Plaintiff has failed to identify a reasonable accommodation, and thus, the Plaintiff will have failed to produce any evidence to rebut the Defendant's claim that no accommodations existed that enabled the Plaintiff to perform the essential duties of the WG-2 position.

Finally, the Defendant states that, after failing to find any accommodations which would enable the Plaintiff to perform the essential duties of a WG-2 employee, it performed a search for vacant positions that the Plaintiff was qualified to perform within his medical restrictions.  (Def. Ex. 20).   The search failed to identify any positions.  *Id.*

The Plaintiff rebuts the Defendant's assertion that no positions existed for which he was qualified by stating that the Defendant was understaffed in food service positions.  (Doc. 21 at 28).   The record reveals evidence that the food service department was ten to twelve people below minimum staffing levels.  (Shamlin Dep. at 12).  However, the Plaintiff has failed to provide "significantly probative" evidence that he was qualified to perform any of these positions.  In fact, the Plaintiff fails to name a single specific vacant position.  Accordingly, the Plaintiff has failed to demonstrate any inconsistency in the Defendant's proffered reason that the Plaintiff was terminated after a search revealed that there were no vacant positions available for which the Plaintiff was qualified.  However, if the Plaintiff proves at trial that the Defendant's accommodation was reasonable and thus, required by the ADA, the Defendant's legitimate non-discriminatory reason of the Plaintiff's failure to name other positions that he is qualified to perform is moot. On the other hand, if  the Plaintiff fails to show at trial that the modified duty position was a reasonable

30

accommodation, then the Plaintiff has failed to carry his burden of identifying an alternative reasonable accommodation, because he has failed to name alternative steps the Defendant could have taken to enable him to perform the essential duties of the WG-2 position and he has failed to identify other vacant positions that he is qualified to perform.

For the foregoing reasons, the Defendant's Motion for Summary Judgment is due to be denied as to the Plaintiff's claim of disability discrimination by termination, because the Plaintiff has created a genuine issue of material fact as to whether the modified duty position was a reasonable accommodation.

### B.      Has The Plaintiff Established A Prima Facie Case Of Retaliation?

To establish a prima facie case of retaliation, the Plaintiff must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse action. *Smith v. BellSouth Telecomm., Inc.,* 273 F.3d 1303, 1314 (11th Cir. 2001).

Plaintiff's only claim of retaliation alleges that the requirement that the Plaintiff undergo (the second) FCE was in retaliation for his prior protected activity of filing EEO Complaints against the Defendant.

### 1.    Were Plaintiff's Prior Actions "Protected Activity?"

It is undisputed that, prior to Plaintiff's being required to undergo the second FCE, he had filed EEO Complaints against the Defendant.  EEO Complaints are undisputedly "protected activity."

### 2.    Was the Second FCE An Adverse Employment Action?

However, the Defendant asserts that the Plaintiff cannot establish a prima facie case of retaliation, because requiring the Plaintiff to undergo the second FCE was not an adverse employment action.  Courts have uniformly held that to establish a prima facie case of retaliation a plaintiff  must establish that he suffered an "adverse employment action."  *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257 (1998); *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997); *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1452 (11th Cir. 1998); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994).  A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Ellerth*, 524 U.S. at 760-61.  Plaintiff must show a *serious and material change* in the terms, conditions or privileges of employment.  *Davis v. Town of Lake*

*Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). Although proof of economic consequences is not required, the asserted impact cannot be speculative and must at least have a tangible adverse effect on Plaintiff's employment. *Id*.

With regard to federal employees, there is a higher threshold as to what constitutes an adverse personnel action. A federal employee alleging workplace discrimination must proceed under the waiver of sovereign immunity in 42 U.S.C. § 2000e-16, which provides that all "personnel actions" affecting federal employees or applicants for employment must be free from discrimination based on race, color, religion, sex or national origin. 42 U.S.C. § 2000e-16(a). In *Page v. Bolger*, 645 F.2d 227 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892 (1982), the Fourth Circuit explained that the term "personnel action" contemplated "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensation." 645 F.2d at 233. The Fourth Circuit further noted that "interlocutory or mediate decisions having no immediate effects upon employment conditions . . . were not intended to fall within the direct proscriptions of [Title VII]." *Id*. Such "interlocutory or mediate decisions" are "simply steps in a process of making such obvious end-decisions as those to hire, to promote, etc." *Id*.

The conclusion that federal employees can pursue discrimination claims only insofar as they concern ultimate employment decisions is also supported by statute.

The federal employee section of Title VII provides that "[a]ll personnel actions affecting [government] employees . . . shall be made free from any discrimination based on race . . ." 42 U.S.C. § 2000e-16(a) (emphasis added).  The term "personnel actions" is distinct from the terminology used elsewhere and is further defined as including any discrimination with respect to the "terms, conditions, or privileges" of employment, 42 U.S.C. § 2000e-16(d).

Plaintiff's being ordered to undergo a second functional capacity evaluation was clearly a mediate step — not a final action which had some adverse impact on Plaintiff.  This Circuit has held that an employment action is not "adverse" merely because the employee dislikes it or disagrees with it.  *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449-50 (11th Cir. 1998).  Neither "every unkind act," *id.* at 1449 (*quoting Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993)), nor "everything that makes an employee unhappy" constitutes an adverse employment action, *id.* at 1450 (*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

The Defendant's requirement that the Plaintiff undergo an FCE was not an adverse employment action.  As to any claims based on this requirement, summary judgment is due to be **GRANTED**.

34

## CONCLUSION

In sum, the Court finds that the Plaintiff has failed to create genuine issues of material fact as to his ability to perform the essential duties of the WG-3 position. However, for the purposes of this motion, the Plaintiff succeeded in establishing viable claims of discrimination by termination.  Thus the Defendant's Motion for Summary Judgment is due to be **GRANTED** in part and **DENIED** in part.

A separate Order will be entered.

**DONE** this 9th day of September, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge